USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/4/22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
F.H., an infant by his Mother and Natural Guardian
EVELYN PICHARDO, and EVELYN PICHARDO,
Individually, and FREDDIE HERNANDEZ,

                              Plaintiffs,

          -against-

THE CITY OF YONKERS, YONKERS BOARD OF
EDUCATION, YONKERS PUBLIC SCHOOLS,
EDWIN M. QUEZADA, PhD, MICHAEL SHAPIRO,
JOHN DOE "1-5" and JANE DOE "1-5,"

                           Defendants.
-------------------------------------------------------------------X

**DECISION AND
ORDER**

19 Civ. 4722 (PED)

**PAUL E. DAVISON, U.S.M.J.**

     This action arises from a series of altercations between plaintiff F.H. and two of his

fellow students, D.R. and R.E., in March-April 2018.  Two of the three altercations, in March

2018, occurred on school property, during school hours.  The third altercation, in April 2018,

occurred off school property on a street corner in the City of Yonkers.  Plaintiffs allege two

claims against the City of Yonkers, the Yonkers Board of Education, Yonkers Public Schools

and individual school officials: (1) a federal claim pursuant to 42 U.S.C. § 1983 for violation of

plaintiffs' substantive due process rights; and (2) a state law claim for negligence (failure to

investigate and inadequate security, training and supervision).[1]

     This case is before me for all purposes on the consent of the parties, pursuant to 28

U.S.C. §636(c). Dkt. #19.  Presently before this Court is defendants' motion for summary

---

[1]  During the first pre-motion conference on October 7, 2021, plaintiffs withdrew their
state law claim for intentional infliction of emotional distress.

judgment (Dkt. #46) seeking dismissal of plaintiffs' Complaint in its entirety.  For the reasons set forth below, defendants' motion is **GRANTED IN PART**.

## I. BACKGROUND

The following facts are gathered from the parties' statements pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, from the pleadings and from affidavits, affirmations and exhibits submitted by the parties in support of their contentions.  Any disputes of material fact are noted.[2]

Plaintiffs Evelyn Pichardo and Freddy Hernandez are the parents and natural guardians of plaintiff F.H. who, at all relevant times, was a minor.  F.H. attended Yonkers Middle High School during the 2017-2018 school year.  Defendant Edwin M. Quezada, PhD is, and at all relevant times was, the Superintendent of the Yonkers Public Schools.  From 2016 through 2018, defendant Michael Shapiro was the Principal of Yonkers Middle High School.

In or about April 2017, F.H.'s school counselor Debra Letang reached out to his parents with concerns about F.H. cutting classes.  Ms. Letang and Vice Principal Yamile Leon[3] were part of the school's team assigned to investigate the cause of F.H.'s attendance problems.  F.H. claimed that he cut classes in January 2018 because he was scared.  Dkt. #47-3, at 16.[4] According to F.H. and his mother, beginning in January or February 2018, several fellow

---

[2] Certain factual allegations in the parties' 56.1 statements, whether disputed or undisputed, have been omitted from the factual recitation because they are not germane to the issues presently before the Court.

[3] Ms. Leon changed her last name to Ledesma subsequent to her deposition.

[4] Unless otherwise noted, citations to page numbers following "Dkt. # __" reflect document (and not ECF) pagination.

students (including R.E. and D.R.) began to verbally bully F.H. (but did not threaten physical violence). Dkt. #47-3, at 8-12; Dkt. #47-4, at 5. F.H. told his mother about the bullying soon after it started, but did not name the students who were bullying him. F.H. did not report the bullying to school officials.

According to Ms. Pichardo, beginning in January 2018, she spoke to Ms. Letang, Principal Shapiro and Ms. [Leon] Ledesma about F.H. being bullied by unidentified fellow students. Dkt. #47-4, at 2, 5; Dkt. #47-17, at 6-8, 12. Ms. Pichardo stated that she spoke most frequently with Ms. Letang about the bullying issue, the lack of security in the school and Ms. Pichardo's demand that F.H. be transferred to another school. Dkt. #50-3, at 3-4 (ECF pagination). According to Ms. Pichardo, she met with Mr. Shapiro seven or eight times about the bullying or transfer issue, and met even more times with Ms. Letang. *Id.* at 7 (ECF pagination). Ms. Letang did not recall F.H.'s parents ever raising any issues about F.H. being bullied. Dkt. #47-5, at 11. According to Ms. [Leon] Ledesma, prior to the March incidents, F.H.'s parents never complained to her that F.H. was being bullied or was afraid to go to school. Dkt. #47-7, at 13-14. According to Mr. Shapiro, from January 2018 until the first incident on March 15, 2018, Ms. Pichardo did not complain to him about the lack of security or that F.H. was being harassed or teased and bullied by other students, nor (to his knowledge) did Ms. Pichardo speak to Ms. Letang regarding F.H. being harassed and bullied by other students. Dkt. #47-8, at 37-39.

On March 15, 2018, as F.H. entered the school cafeteria, he got involved in an altercation with some fellow students. The altercation began when one of F.H's friends (R.G.) started fighting with another student in the cafeteria. After teachers broke up the fight, F.H. left school without permission because he was afraid a bigger fight would happen. F.H. was not injured as a

result of the fight.  Yonkers police officers responded.  Later that afternoon, Yonkers police officer Capowski reported the incident to Braulio Fernandez (from Yonkers Public Schools Division of Teaching and Learning), who sent an email to school officials (including Mr. Quezada and Brian Schulder, the District's director of school safety) notifying them of the incident and stating that Officer Capowski "mentioned it was gang related." Dkt. #50-7.  Ms. [Leon] Ledesma investigated the altercation and determined that F.H., R.G. and D.R. were involved in the fight.  All three were suspended for five days and, as a result of the incident and the ensuing suspensions, all three had Superintendent hearings.

The Yonkers Public Schools' Code of Conduct states that bullying, harassment and participation in gangs constitute Level III Prohibited School Conduct which requires the following disciplinary response: minimum suspension of 1 day, up to 5 school days per occurrence; administration/student/parent/teacher conference; and Superintendent's Hearing for repeated offenses. Dkt. #50-9, at 19-20 (ECF pagination).

Prior to the March 15th incident, Ms. Leon suspected D.R. and R.E. were gang members. Dkt. #50-4, at 26-28.  Mr. Shapiro avers that he was not aware that R.E. was part of a gang. Dkt. #47-8, at 48.  Mr. Shapiro was aware that R.E., prior to March 2018, was insubordinate and refused to follow certain school rules but Mr. Shapiro did not think R.E. was violent. *Id.* at 49-50.  Mr. Shapiro believed R.E. had been suspended prior to March 2018 due to his insubordination. *Id.* at 50.  Mr. Shapiro stated that D.R. had not been violent prior to March 2018, but Mr. Shapiro did not recall whether D,R, had any disciplinary issues prior to March 2018. *Id.* at 48-50.  Mr. Shapiro did not recall any issues of bullying involving either D.R. or R.E. prior to the March 15th incident. *Id.* at 52.

According to Ms. Pichardo, on March 16, 2018 during a meeting with Mr. Shapiro and Ms. [Leon] Ledesma regarding the prior day's incident, Ms. Pichardo asked Mr. Shapiro to transfer F.H. to another school. Dkt. #50-3, at 5-7 (ECF pagination). Ms. Pichardo stated that Principal Shapiro said he would see what he could do, "but he never gave a follow-up to that." *Id.* at 6-7 (ECF pagination).

Sometime after the March 15th incident, during a meeting with D.R., school officials learned that he was a member of the Bloods street gang. Dkt. #50-6, at 45. Mr. Shapiro contacted D.R.'s mother and got school counselors involved, but D.R. was allowed to continue to attend school. *Id.* at 45-46.

F.H., R.G. and D.R. returned to school on Friday, March 23, 2018. According to F.H., before gym on Wednesday, March 28, 2018, R.E. approached F.H. and said he would beat F.H. up. Dkt. #47-3, at 26. After gym class, F.H. went down the stairs to the bathroom near the cafeteria on the floor below. F.H. opened the stairway door and exited the stairway; R.E. approached him and punched him. *See* Def. Exh. P (video surveillance). Subsequently, D.R. and another boy joined the fight. Dkt. #47-3, at 30; *see* Def. Exh. P. The altercation was over quickly; a teacher broke it up. Yonkers police arrived and arrested R.E.; F.H. was issued an order of protection against R.E. R.E. was suspended from school for five days, and received a Superintendent hearing. D.R. was also suspended from school for five days, and did not return.

Stephen Trusa was the hall monitor in the area where the March 28th fight occurred. During the 2017-2018 school year, according to Mr. Shapiro, the school had (on a daily basis) three school safety officers (Mr. Thomas, Ms. Travado and Mr. Edwards), plus one substitute school safety officer (Mr. Trusa). Dkt. #47-8, at 22-23, 25. According to Mr. Schulder (the

director of school safety), during March and April 2018, the school had four full-time public safety officers (Mr. Thomas, Mr. Edwards, Ms. Travado and Mr. Eegan). Dkt. #50-5, at 65, 67. Mr. Schulder was familiar with Mr. Trusa, but did not know what his role was at that time and thought he was a substitute teacher. *Id.* at 65-66. Until Mr. Schulder saw the video of the March 28th incident, he was not aware that Mr. Trusa had any role in safety/security at Yonkers Middle School. *Id.* at 66. Mr. Trusa did not report to Mr. Schulder; Mr. Schulder did not hire or train Mr. Trusa. *Id.* at 66-67.

On April 11, 2018, F.H.'s Superintendent's Hearing was held in connection with the March 15th incident. Ms. [Leon] Ledesma attended as the district's representative. At the hearing, according to Ms. [Leon] Ledesma, F.H.'s father kept bringing up the March 28th incident and insisted that F.H. be transferred to another school. Dkt. #50-4, at 29-30 (ECF pagination). Ms. [Leon] Ledesma testified that the Hearing Officer: reiterated to F.H.'s father that the hearing only pertained to the March 15th incident; stated that he could not promise that F.H. would be transferred: and offered alternative options. Dkt. #50-4, at 29-31 (ECF pagination). Ultimately, according to Ms. [Leon] Ledesma, F.H.'s father agreed to one of the proposed alternatives: F.H. would "go on home and hospital and receive his instruction for the remainder of the year from home, and at the end of the school year, [his parents could] request a transfer to another school." *Id.* at 31. However, Ms. [Leon] Ledesma acknowledged that the Hearing Officer's report reflected a slightly different outcome: F.H. would be suspended for the remainder of the school year (beginning April 2, 2018 through June 25, 2018); he could access the Yonkers Public Schools' home instruction program during that time; and he could return to his assigned school for the 2018-19 school year. *Id.* at 31-32 (ECF pagination).

On Saturday, April 21, 2018 at approximately 8:20 p.m., on the corner of Palisade and Elm Street in the City of Yonkers (not on school grounds), D.R. slashed F.H in the neck with a pocket knife.  On September 26, 2018, D.R. pled guilty to second degree assault.  Dkt. #50-8. On October 31, 2018, D.R. was sentenced to a prison term of three and a half years; the Court issued a Final Order of Protection for the benefit of F.H.  *Id.*

At the beginning of the 2018-19 school year, F.H. was transferred to Lincoln High School.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material within the meaning of Rule 56 where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.  In determining whether the moving party has met its burden of proving that there are no genuine disputes of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).

Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration in

original) (quotation and citation omitted).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996).   On the other hand, summary judgment must be denied if the court finds "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *See Anderson*, 477 U.S. at 250.

## III.  DISCUSSION

A.  § 1983 Substantive Due Process Claim

Plaintiffs contend that defendants' failure to protect F.H. from being wrongfully bullied and physically attacked by fellow students constituted a violation of substantive due process. "The touchstone of due process is protection of the individual against arbitrary action of government." *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022) (quotation marks and citations omitted).  Thus, the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).  In other words, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.  The Second Circuit has recognized two exceptions to this rule:

> First, the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a "special relationship" with the victim. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir.1993) (citing *DeShaney*, 489 U.S. at 198, 109 S. Ct. 998).  Second, the state may owe such an obligation if its agents "in some way had assisted in creating or increasing the danger to the victim." *Dwares v. City of New York*, 985 F.2d 94, 98-99 (2d Cir.1993) (citing *DeShaney*, 489 U.S. at 201, 203, 109 S. Ct. 998), *overruled on other grounds by*

-8-

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507
U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed.2d 517 (1993).

*Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008). "Even if a plaintiff falls within

one of these two exceptions and can demonstrate that the defendants have a constitutional

obligation to protect him, he must also show that the defendants' behavior 'was so egregious, so

outrageous, that it may fairly be said to shock the conscience.' " *DeRouseau v. Martello*, No. 21

Civ. 8711, 2022 WL 889182, at *3 (S.D.N.Y. Mar. 25, 2022) (quoting *Matican*, 524 F.3d at 155

(internal quotation marks and citation omitted)). "In determining whether conduct shocks the

contemporary conscience, 'conduct intended to injure in some way unjustifiable by any

government interest is the sort of official action most likely to rise to the conscience-shocking

level.' " *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). "By contrast,

'negligently inflicted harm is categorically beneath the threshold. ' " *Id.*

    *1.  Special relationship exception*

    "The special relationship exception grows from the DeShaney Court's observation that

'in certain limited circumstances the Constitution imposes upon the State affirmative duties of

care and protection with respect to particular individuals.' " *Matican*, 524 F.3d at 155 (quoting

*DeShaney*, 489 U.S. at 198). "Such a special relationship exists, for example, when a person is

incarcerated in a state prison or mental institution." *P.W. v. Fairport Cent. Sch. Dist.*, 927 F.

Supp.2d 76, 81 (W.D.N.Y. 2013) (citing *DeShaney*, 489 U.S. at 198-200). Since *DeShaney*, the

Second Circuit has "focused on involuntary custody as the linchpin of any special relationship

exception." *Matican*, 524 F.3d at 156.

    Plaintiffs allege that defendants had a "special duty" to protect F.H. because "a state

imposing compulsory attendance upon school children must take reasonable steps to protect those required to attend from foreseeable risks of personal injury or death." Dkt. #50, at 15 (ECF pagination). "While the Second Circuit has not squarely decided the issue, courts in this Circuit and elsewhere have generally held that '[e]ven in light of compulsory [education] attendance laws, no special relationship is created between students and school districts such that school districts take on any such duty to protect students from the private actions of others,' including 'assaults by other students.' " *H.B. v. Monroe Woodbury Cent. Sch. Dist.*, No. 11 Civ. 5881, 2012 WL 4477552, at *10 (S.D.N.Y. Sept. 27, 2012) (quoting *Santucci v. Newark Valley Sch. Dist.*, No. 05 Civ. 971, 2005 WL 2739104, at *3 (N.D.N.Y. Oct. 24, 2005). *See Gingrich v. William Floyd Sch. Dist.*, No. 17 Civ. 3501, 2018 WL 3057719, at *4 (E.D.N.Y. June 20, 2018) ("As the overwhelming weight of authority suggests, the special relationship exception does not apply in the school setting."); *Doe v. Enfield Bd. of Educ.*, No. 17 Civ. 1894, 2018 WL 2725452, at *5 (D. Conn. June 6, 2018); *Milton v. Valley Stream Cent. High Sch. Dist.*, No. 15 Civ. 0127, 2018 WL 1136909, at *8 (E.D.N.Y. Mar. 1, 2018) ("Therefore, this Court joins the majority of courts and holds that Z.G.M.'s status as a student does not impose a constitutional obligation on the District to protect him from private harm, and as a result, Plaintiffs cannot rely on the special relationship exception as the basis for their substantive due process claims."); *Reid ex rel. Roz B. v. Freeport Pub. Sch. Dist.*, 89 F. Supp.3d 450, 458 (E.D.N.Y. 2015); *Gagnon ex rel. MacFarlane v. E. Haven Bd. of Educ.*, 29 F. Supp.3d 79, 84 (D. Conn. 2014); *Campbell v. Brentwood Union Free Sch. Dist.*, 904 F. Supp.2d 275, 280 (E.D.N.Y. 2012) ("Importantly, courts are generally in agreement that the 'special relationship' doctrine does not apply to a school setting.").

-10-

Plaintiffs, in support of their position, rely primarily upon *Pagano by Pagano v. Massapequa Public Schools*, 714 F. Supp. 641, 643 (E.D.N.Y. 1989) and *Lichtler v. Cnty of Orange*, 813 F. Supp. 1054 (S.D.N.Y. 1993)).[5]  "However, these two cases have not been widely followed and have been expressly rejected by some subsequent cases." *Doe*, 2018 WL 2725452, at *4. *See HB*, 2012 WL 4477552, at *10 (*Pagano* "did not address the issue in depth, was decided over twenty years ago, and has since been distinguished by several other courts based in part on subsequent authority"); *Crispim v. Athanson*, 275 F. Supp.2d 240, 247 (D. Conn. 2003) (disagreeing with *Pagano* and *Lichtler*).  I am more persuaded by the reasoning of courts in this Circuit (and others) who have rejected application of the special relationship exception to cases of peer-on-peer bullying in schools on the ground that, "while school attendance is compulsory, the parent ultimately determines the type of education his or her child will receive (private, public, home school), and while schools impose certain rules and restrictions on students, they do not limit an individual's freedom to act in the same manner as involuntary confinement by the state in a state prison or mental institution." *P.W.*, 927 F. Supp.2d at 82 (citations omitted). Thus, I agree with the majority of courts and find that compulsory school attendance laws do not create a "special relationship" imposing a constitutional obligation on school districts to protect students from peer-on-peer harm.

---

[5]  Plaintiffs cite two additional cases in support of the proposition that the special relationship exception applies here: *Robert G. v. Newburgh City School District*, 1990 WL 3210, 1990 U.S. Dist. LEXIS 91 (S.D.N.Y. Jan. 5, 1990) and *Doe v. New York City*, 649 F.2d 134 (2d Cir.1981).  In *Robert G.*, the infant plaintiff had been sexually assaulted (during school hours and on school property) by a substitute teacher.  1990 WL 3210, at *1.  In *Doe*, plaintiff sought damages from the city agency supervising her foster care, for various forms of child abuse allegedly inflicted upon her in her foster home, by her foster father.  649 F.2d at 137.  Because neither *Robert G.* nor *Doe* involved peer-on-peer violence in a public school, plaintiffs' reliance on those cases is misplaced.

Finally, plaintiffs argue that defendants owed a "special duty" to F.H. arising from the

Dignity for All Students Act ("DASA"), N.Y Cons. Law Serv. Educ. §§ 10 *et seq.*, and

defendants' own Code of Conduct (*see* Dkt. #50-9).  However, "[v]iolations of institutional

policy or state law are not a basis for a Section 1983 claim." *Milton*, 2018 WL 1136909, at *10.

Accordingly, plaintiffs cannot rely on the special relationship exception as the basis for their

substantive due process claim.

### 2. State-created danger exception

Under the state-created danger exception, "state actors may be liable under section 1983

if they affirmatively created or enhanced the danger of private violence." *Okin v. Vill. of*

*Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009).  "Liability under this

theory turns on whether the state conduct contributing to the victim's injury was 'affirmative,'

which can give rise to liability, or 'passive,' which cannot give rise to liability." *Hernandez v.*

*City of New York*, No. 18 Civ. 6418, 2022 WL 316938, at *8 (S.D.N.Y. Feb. 2, 2022) (citations

omitted).  "The Second Circuit has emphasized that '[o]nly an affirmative act can amount to a

violation of substantive due process, because the Due Process Clause is phrased as a limitation

on the State's power to act, not as a guarantee of certain minimal levels of safety and security.' "

*Est. of M.D. by DeCosmo v. New York*, 241 F. Supp.3d 413, 424 (S.D.N.Y. 2017) (quoting

*Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007)).  In some cases, "the affirmative conduct

of a government official may give rise to an actionable due process violation if it communicates,

explicitly or implicitly, official sanction of private violence." *Cruz v. Cnty. of Ulster*, No. 19

Civ. 377, 2022 WL 4225220, at *7 (N.D.N.Y. Sept. 13, 2022) (quotation marks and citation

omitted).  In other words, "[t]he State affirmatively creates a victim's danger when its agents

communicate, explicitly or implicitly, to a third party encouragement or official sanction to attack

the victim, usually including an affirmation that the third party may attack the victim with

impunity. *Doe v. Bedford Cent. Sch. Dist.*, No. 18 Civ. 11797, 2019 WL 6498166, at *5

(S.D.N.Y. Dec. 3, 2019) (quoting *Matican*, 524 F.3d at 157) (citation omitted).  Thus, "it is

insufficient to allege that a state actor failed to protect an individual, even from a known danger

of bodily harm or failed to warn that individual of such danger . . . [including] dangers arising

from private parties." *Est. of M.D. by DeCosmo*, 241 F. Supp.3d at 425 (internal citation

omitted).

Here, plaintiffs argue that defendants engaged in the following affirmative acts which,

according to plaintiffs, "created an opportunity for harm to F.H.": (1) defendants refused to

transfer F.H. to another school; (2) they ignored complaints of bullying; (3) they failed to

discipline D.R. in any meaningful way; (4) they failed to follow their own policies/procedures

regarding assaults, gang members and supervision of students; and (5) they failed to follow

DASA mandatory policies and procedures regarding harassment, investigation and reporting.

Dkt. #50, at 19-20 (ECF pagination).  Even assuming the truth of these allegations, they

demonstrate (at worst) defendants' passive failures to prevent the danger to F.H. – a far cry from

establishing any affirmative conduct on defendants' part which caused or enhanced the danger of

harm to F.H.  Courts in this Circuit have routinely declined to deem allegations that a school

district failed to act in peer-to-peer school bullying incidents as "state-created" danger under

Section 1983. *See Gingrich*, 2018 WL 3057719, at *5 (no state-created danger where school

district allegedly had notice of threats and bullying by one student against another pre-dating a

physical attack, but no allegation that school district encouraged or sanctioned that attack); *Doe*,

-13-

2018 WL 2725452, at *7 (school defendants' alleged failure to prevent or intervene in a sexual

assault insufficient to establish state-created danger absent allegations of defendants' affirmative

conduct which created a dangerous condition); *Drain v. Freeport Union Free Sch. Dist.*, No. 14

Civ. 1959, 2015 WL 1014451, at *2 (E.D.N.Y. Mar. 9, 2015); *Reid*, 89 F. Supp.3d at 460; *P.W.*,

927 F. Supp.2d at 82 ("[T]he failure to respond to any particular incident or the failure to

adequately discipline a student in a manner that would prevent future bullying is insufficient to

state a claim for a violation of due process based on a state created danger, absent an indication

that school officials in some way communicated an official sanction of the bullying."); *H.B.*,

2012 WL 4477552, at *10-11; *Chambers v. No. Rockland Cent. Sch. Dist.*, 815 F. Supp.2d 753,

764-69 (S.D.N.Y. 2011) (finding no state-created danger in the absence of a school district's

explicit or implicit communication of an official sanction of the bullying or harassment).

    In sum, plaintiffs fail to proffer evidence which establishes either the special relationship

exception or the state-created danger exception.  Accordingly, defendants are entitled to

summary judgment on plaintiffs' § 1983 substantive due process claim.[6]

B.  State Law Negligence Claim

    Defendants urge this Court to decline to exercise supplemental jurisdiction over the

remaining state law negligence claim.  Dkt. #49, at 24-25.  A district court "may decline to

---

    [6] Having concluded that plaintiffs fail to establish a substantive due process violation, I
need not address the municipal defendants' potential liability under *Monell v. Dep't of Social
Servs.*, 436 U.S. 658 (1978) with respect to the § 1983 claim.  *See Segal v. City of New York*, 459
F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying
constitutional violation, its decision not to address the municipal defendants' liability under
Monell was entirely correct.").  For the same reason, I need not address defendants' argument
that the individual defendants are entitled to qualified immunity.  *See Reid*, 89 F. Supp.3d at 460;
*Elias v. Vill. of Spring Valley*, 81 F. Supp.3d 312, 322 (S.D.N.Y. 2015).

exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original

jurisdiction." 28 U.S.C. § 1367(c)(3). "Once a district court's discretion is triggered under §

1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and

comity . . . in deciding whether to exercise jurisdiction." *Kolari v. New York-Presbyterian*

*Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quotation marks and citation omitted). To this end:

> When analyzing judicial economy, district courts consider several issues,
> including their familiarity with the facts, the timing of the case, the number of
> parties and claims, the amount of discovery, and whether there is ongoing parallel
> litigation. In weighing convenience, courts ask whether the case is easily
> resolvable, and, if it is, whether it is more appropriate to resolve the case than
> decline to exercise jurisdiction. When evaluating fairness, district courts balance
> questions of equity; Will declining jurisdiction prejudice the parties, and are the
> parties responsible for any such prejudice?

*Vincenzo v. Wallkill Cent. Sch. Dist.*, No. 21 Civ. 0308, 2022 WL 913094, at *10 (N.D.N.Y.

Mar. 29, 2022).

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance

of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law

claims." *Kolari*, 455 F.3d at 122 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350

n.7 (1988)). This case, however, is not the "usual" case. The parties consented to my

jurisdiction over three years ago; since then, this case has lumbered through an extensive

discovery process (complicated by the Covid-19 pandemic), an aborted summary judgment

motion regarding the negligence claim (due November 30, 2021 but, by letter dated November

29, 2021 (Dkt. #36), defendants stated they would not be filing the motion) and an unsuccessful

settlement conference (on February 14, 2022). The case was trial-ready at that point but, due to

Covid-19 protocols, the earliest available trial date was May 31, 2022. On March 1, 2022, I

issued a Trial Order pursuant to which motions in limine were due on April 18, 2022.  The

parties timely filed motions in limine; defendants' motion, however, exceeded the normal limits

of a motion in limine and sought dismissal of the federal claim.  Procedural irregularities

notwithstanding, defendants' motion presented a compelling challenge to the viability of

plaintiffs' federal claim.  At the next conference (on April 26, 2022), driven by concerns of

fairness and judicial economy, I adjourned the trial date, tabled the motions in limine and set a

summary judgment motion schedule.  Defendants' summary judgment motion became fully

submitted on July 15, 2022.  Given the prolonged path of this litigation, it would be patently

unfair to decline jurisdiction over the remaining negligence claim (which, notably, does not

involve issues that are novel or particularly complex).  At bottom, it is apparent that the interests

of judicial economy, convenience and fairness will best be served if this Court retains jurisdiction

over plaintiffs' negligence claim.

As to the merits of plaintiffs' negligence claim, "[i]t is well settled that a school owes a

common-law duty to adequately supervise its students." *Stephenson v. City of New York*, 19

N.Y.3d 1031, 1033, 978 N.E.2d 1251, 954 N.Y.S.2d 952 (2012).  The New York Court of

Appeals has explained the boundaries of a school's duty to its students:

> Schools are not, however, insurers of students' safety and cannot reasonably be
> expected to continuously supervise and control all movements and activities of
> students; therefore, schools are not to be held liable for every thoughtless or
> careless act by which one pupil may injure another.  Generally, the duty of care
> does not extend beyond school premises.  As this Court has explained: "When [the
> school's] custody ceases because the child has passed out of the orbit of its
> authority in such a way that the parent is perfectly free to reassume control over
> the child's protection, the school's custodial duty also ceases" (Pratt [v.
> Robinson], 39 NY2d [554] at 560 [1976]).  Nevertheless, we have, in certain
> situations, extended the duty to off-school premises injuries (see Bell v Board of
> Educ. of City of N.Y., 90 NY2d 944 [1997]; Ernest v Red. Cr. Cent. School Dist.,

93 NY2d 664 [1999]).  However, those cases found liability on the part of the
school for injury that occurred either during school hours or shortly thereafter
upon the student's departure from the school.

*Id.*, 19 N.Y.3d at 1033-34 (internal quotation marks and citations omitted).  *See Anglero v. New*

*York City Bd of Ed.*, 2 N.Y.3d 784, 813 N.E.2d 586, 780 N.Y.S.2d 506 (2004) (summary

judgment denied in wrongful death case; questions of fact as to whether safety officer/teachers

heard call for help but did nothing to stop first assault–on school premises–and whether their

intervention might have averted the second assault. "which occurred off school grounds a short

time later").

Here, defendants argue – and I agree – that they cannot be held liable for the April 2018

encounter between D.R. and F.H., during which D.R. slashed F.H. in the neck with a pocket

knife.  The attack occurred during a Saturday evening, off school property, on a street corner in

the City of Yonkers.  The attack took place on April 21, 2018 –  almost one month (25 days) after

the previous altercation on March 28, 2018.  D.R. was suspended for five days following the

March 28th incident, and he did not return to school.  There is no evidence (or even an allegation)

that school officials were on notice of the possibility that D.R. would attack F.H. off school

property.  The absence of such evidence, combined with the amount of time which elapsed

between the March 28th incident and the April 21st attack, precludes a finding that F.H. was

within the "orbit" of the school's authority.  Accordingly, defendants may not be held liable for

the April 21, 2018 attack or any injuries arising therefrom.

On the other hand, genuine issues of material fact preclude summary judgment as to

defendants' liability for the March 28, 2018 incident.[7]  Accordingly, defendants' motion for summary judgment on plaintiffs' negligence claim is granted in part.

## IV.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED IN PART**:

1.  Plaintiffs' § 1983 substantive due process claim is DISMISSED; and

2.  Plaintiffs' negligence claim ARISING FROM THE APRIL 21, 2018 INCIDENT IS DISMISSED.

Defendants' motion for summary motion is **DENIED** as to plaintiffs' negligence claim arising from the March 28, 2018 incident.  To be clear, the negligence claim arising from the March 28, 2018 incident is the only claim remaining for trial.

The Clerk of the Court is respectfully directed to terminate the pending motion (Dkt. #46).

The Court has scheduled a Pretrial Conference on November 30, 2022 at 11:00 a.m. in Courtroom 420.

Dated:   November 4, 2022            **SO ORDERED.**
          White Plains, New York

_____
PAUL E. DAVISON, U.S.M.J.

---

[7] F.H. was not injured as a result of the March 15, 2018 incident. "Under New York law . . . a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp.3d 359, 385 (S.D.N.Y. 2019) (quotation marks and citations omitted).